22 A.3d 1 (2011)
420 N.J. Super. 395
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiff-Appellant,
v.
EXXON MOBIL CORPORATION, Defendant-Respondent.
No. A-0314-09T2.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 2011.
Decided May 31, 2011.
Richard F. Engel, Deputy Attorney General, argued the cause for appellant (Paula T. Dow, Attorney General, attorney; Mr. Engel, Allan Kanner (Kanner & Whiteley), Rebecca J. Davis (Kanner & Whiteley), and Elizabeth B. Petersen (Kanner & Whiteley) of the Louisiana bar, admitted pro hac vice, of counsel and on the brief).
Theodore V. Wells, Jr. (Paul, Weiss, Rifkind, Wharton & Garrison) argued the *2 cause for respondent (Archer & Greiner, P.C., and Mr. Wells, attorneys; Marc A. Rollo, Steven J. Fram, Haddonfield, Arthur H. Jones, Jr., Daniel J. Toal (Paul, Weiss, Rifkind, Wharton & Garrison) of the New York bar, admitted pro hac vice, and Alice A. Brown (Exxon Mobil Corporation) of the Texas bar, admitted pro hac vice, on the brief).
Before Judges CARCHMAN, GRAVES and WAUGH.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
This appeal addresses the issue of whether plaintiff Department of Environmental Protection (DEP) is barred by the statute of limitations, N.J.S.A. 2A:14-1.2, from pursuing a common law strict liability claim against defendant Exxon Mobil[1] seeking to obtain natural resource damages under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.11z (Spill Act). We must determine whether N.J.S.A. 58:10B-17.1 (the extension statute) applies to a claim for relief based on common law strict liability.[2]
The Law Division judge concluded that the statute of limitations barred the claim and that the extension statute did not apply. He dismissed the fourth count of plaintiff's complaint asserting that cause of action. We granted leave to appeal and now conclude that the extension statute preserves this common law cause of action. Accordingly, we reverse, reinstate the fourth count of the complaint and remand for further proceedings.

I.
We first set forth the procedural history. In August 2004, DEP filed two complaints against defendant, asserting Spill Act claims and common law claims of public nuisance and trespass, and seeking natural resource damages for the discharge of hazardous substances at two sites in Linden and Bayonne. Exxon Mobil I, supra, 393 N.J.Super. at 397, 923 A.2d 345. After we decided the loss of use claim issue in DEP's favor, DEP moved to amend the complaints, over defendant's objections, to include strict liability counts.
Thereafter, the trial court heard argument on defendant's motions for partial summary judgment asserting, among other things, that the statute of limitations had expired on DEP's common law claims for nuisance and trespass, and that the extension statute, N.J.S.A. 58:10B-17.1, did not apply. The judge granted that motion, and DEP did not seek interlocutory relief.
Defendant then moved for partial summary judgment seeking to dismiss count four of DEP's complaint, alleging a common law strict liability claim, under that same statute of limitations rationale. The judge granted defendant's motion and dismissed that count. We granted leave to appeal.
These relevant facts are best summarized in our decision in Exxon Mobil I, supra, 393 N.J.Super. at 397, 923 A.2d 345, and in the trial court's January 22, 2009 letter opinion. Included in that latter summary, the judge said:

*3 During the course of operations at the Bayonne and Bayway refineries, crude oil and refined products were lost through spills and leaks. Neither party disputes that these products, which include, inter alia, monocyclic aromatics, PAHs, amines, pesticides, and various inorganics such as chromium and arsenic, are considered hazardous substances. The contamination at both of these sites is well-documented. It was estimated in 1977 that at least some seven million gallons of oil, ranging in thickness from 7 to 17 feet, are contained in the soil and groundwater underlying a portion of the former Bayonne site alone. As of 2006, 17 non-aqueous phase liquid plumes were present in the groundwater at Bayonne. The documented level of contamination in the waters and sediment of the Platty Kill Canal in Bayonne is so high that ExxonMobil has recommended permanently closing and filling in the canal with an impermeable barrier (estimating 50,000 cubic yards of impacted sediments). Additionally, Morses Creek has been subject to years of discharges resulting in a hydrocarbon content ranging from 640 to 280,000 ppm which has subjected the area to a gelatinous, oily emulsion overlying gray silt.
Focusing on the statute of limitations, prior to 1991, statutes of limitation did not run against the State, pursuant to the common law doctrine of nullum tempus occurrit regi. N.J. Dep't of Envtl. Prot. v. Caldeira, 171 N.J. 404, 407, 794 A.2d 156 (2002). When the Court abolished that doctrine in 1991, "insofar as it would preclude the application of general statutes of limitations to the State," the Legislature responded by adopting the ten-year statute of limitations. N.J.S.A. 2A:14-1.2. Caldeira, supra, 171 N.J. at 408-09, 794 A.2d 156 (quoting N.J. Educ. Facilities Auth. v. Gruzen P'ship, 125 N.J. 66, 76, 592 A.2d 559 (1991)).
N.J.S.A. 2A:14-1.2(a) provides:
a. Except where a limitations provision expressly and specifically applies to actions commenced by the State or where a longer limitations period would otherwise apply, and subject to any statutory provisions or common law rules extending limitations periods, any civil action commenced by the State shall be commenced within ten years next after the cause of action shall have accrued.
In July 2001, that general statute was amended by L. 2001, c. 154, § 7, so that it referenced another new provision, the extension statute, governing environmental contamination matters:
The provisions of this section shall not apply to any civil action commenced by the State concerning the remediation of a contaminated site or the closure of a sanitary landfill facility, or the payment of compensation for damage to, or loss of, natural resources due to the discharge of a hazardous substance, and subject to the limitations period specified in section 5 of P.L.2001, c. 154 (C. 58:10B-17.1).
[Ibid.]
The extension statute was again amended and currently provides:
b. (1) Except where a limitations provision expressly and specifically applies to actions commenced by the State or where a longer limitations period would otherwise apply, and subject to any statutory provisions or common law rules extending limitations periods, any civil action concerning the payment of compensation for damage to, or loss of, natural resources due to the discharge of a hazardous substance, commenced by the State pursuant to the State's environmental laws, shall be commenced within *4 five years and six months next after the cause of action shall have accrued.
[N.J.S.A. 58:10B-17.1(b)(1) (emphasis added).]
When it was initially enacted in July 2001, that last phrase read "shall be commenced within four years next after the cause of action shall have accrued." L. 2001, c. 154, § 5. The further expansion to "five years and six months" was adopted in December 2005 by L. 2005, c. 245, § 1.
The extension statute further defines the term "State's environmental laws," providing that it
means the "Spill Compensation and Control Act," P.L.1976, c. 141 (C.58:10-23.11 et seq.), the "Water Pollution Control Act," P.L.1977, c. 74 (C.58:10A-1 et seq.), P.L.1986, c. 102 (C.58:10A-21 et seq.), the "Brownfield and Contaminated Site Remediation Act," P.L.1997, c. 278 (C.58:10B-1.1 et al.), the "Industrial Site Recovery Act," P.L.1983, c. 330 (C.13:1K-6 et al.), the "Solid Waste Management Act," P.L.1970, c. 39 (C.13:1E-1 et seq.), the "Comprehensive Regulated Medical Waste Management Act," P.L.1989, c. 34 (C.13:1E-48.1 et seq.), the "Major Hazardous Waste Facilities Siting Act," P.L.1981, c. 279 (C.13:1E-49 et seq.), the "Sanitary Landfill Facility Closure and Contingency Fund Act," P.L.1981, c. 306 (C.13:1E-100 et seq.), the "Regional Low-Level Radioactive Waste Disposal Facility Siting Act," P.L.1987, c. 333 (C.13:1E-177 et seq.), or any other law or regulation by which the State may compel a person to perform remediation activities on contaminated property [.]
[N.J.S.A. 58:10B-17.1(c) (emphasis added).]
In its January 22, 2009 letter opinion, the trial court agreed with defendant that the statute of limitations had expired on DEP's common law claims for nuisance and trespass, and that N.J.S.A. 58:10B-17.1 did not apply. Defendant had argued that DEP was required to file the claims within ten years of January 1, 1992, because the extension statute was inapplicable. Referencing the extension statute's definition of "State's environmental laws," the trial court wrote that the nuisance and trespass claims at issue in that motion were not among the enumerated statutes, and they "also are clearly not statutory law but are common law claims. They also, at their foundation are not environmental laws per se but laws of general application to a wide variety of situations." After setting forth the parties' contentions, the letter opinion continued:
The court is confident that the legislature's intent in referring to a "law or regulation[,"] in light of the previously mentioned nine statutes, did not intend to incorporate general common law into the limitations exceptions of 58:10B-17.1c. This reading is consistent with the principle of ejusdem generis raised by Exxon . . . [citing to and block quoting from State v. Hoffman, 149 N.J. 564, 584, 695 A.2d 236 (1997)].
Reading the statute on its face, the court is not convinced that such a broad reading should take place in order to apply general common law claims into a statute which clearly was intended to apply to only certain types of laws. This court is simply left with no authority for the presumption that such a wide ranging expansion of the statute of limitations for environmental statutes should be extended to common law claims. Therefore the motion for summary judgment as [to] common law claims in regards to statute of limitations is GRANTED.
DEP did not seek leave to appeal this January 2009 ruling regarding the common law claims for nuisance and trespass.
*5 At the July 23, 2009 hearing on the motion regarding the strict liability claim, the court referenced the history of the litigation and its denial of relief as to the nuisance and trespass claims. The court continued:
Exxon now moves to extend this ruling to the recently filed common-law claim of strict liability. DEP in their opposition, if they didn't attempt to convey to the court that the court perhaps had used faulty reasoning originally and if they didn't really want me to reconsider, they certainly suggested that perhaps a review of the matter again might lead this court to a contrary analysis.
I'm not convinced as to why the strict liability claim should be treated any differently [than] we treated the nuisance and trespass claim. They argue that the environmental laws often involve aspects of strict liability and therefore the common-law claim could fit into the statute as state environmental laws. Again, the court is not persuaded, the Motion is granted.
This appeal followed.

II.
On appeal, DEP argues that the judge erred in dismissing the strict liability claim. It asserts that the common law is part of the "State's Environmental Law" so that the extension statute applies; the judge's conclusion is contrary to caselaw; and the conclusion reached by the motion judge will lead to absurd results. We address each issue seriatim.

A.
DEP first argues that the State's authority to seek redress for environmental harms includes both common law and statutory law. To summarize its argument, DEP claims that the authority originated in the common law establishing the "public trust doctrine," under which the State as trustee invokes common law rights against polluters. The argument continues that at common law, strict liability was developed to fill a gap where trespass and nuisance claims inadequately protected landowners; later, a 1979 Spill Act amendment provided statutory strict liability against dischargers of hazardous substances. Additionally, courts have held that Spill Act liability does not eliminate common law liability, and nothing in the extension statute demonstrates a legislative intent to so limit DEP's authority.
DEP further asserts that the extension statute is "clear and unambiguous." The statute's purpose is to extend the statute of limitations for actions that seek redress for natural resource damages, and the relevant statutory phrasing has been interpreted in other contexts to include common law and statutory law. The Legislature's intent was to expand, and not constrict, the State's ability to recover damages from dischargers. DEP contends that the Legislature has shown a "strong and unyielding commitment to holding dischargers of hazardous substances accountable," further shown by its acts in extending the statute of limitations. The extension statute, as part of the remedial Spill Act, should be construed broadly to ensure that the Legislature's goal is met. According to DEP, the trial court's reliance on the doctrine of ejusdem generis was contrary to the Legislature's intent to preserve DEP's broad authority to pursue natural resource damage claims. Moreover, the trial court's approach renders as mere surplusage the phrase "any other law or regulation," which the Legislature could have refined to refer only to statutes or to expressly exclude common law had that been the Legislature's intent. The common law remains important in DEP's *6 litigation efforts, especially for filling in any gaps in relief that the statutes may fail to cover, so justice demands that polluters not be allowed to erode DEP's broad enforcement authority.
Defendant responds that DEP is arguing against a "straw man," because the trial court did not exclude or eliminate common law liability; it merely held that DEP waited too long to assert those claims. In any event, the Spill Act provides DEP with complete relief for any existing complaints as to which the common law claims would be barred. According to defendant, the Legislature and courts routinely use the phrase "environmental laws" to refer to the state's various statutory schemes that touch upon environmental issues. The limits of the term "the State's environmental laws" is key, and courts have held that similar phrases following lists of statutes refer only to positive enactments and not to common law. Defendant also notes that the definition of the term "the State's environmental laws" was not original to the extension statute, but rather was borrowed from the Brownfield and Contaminated Site Remediation Act (the Brownfield Act), N.J.S.A. 58:10B-12(e); in both instances, the legislative focus was on statutes, and not common law. Finally, the trial court correctly applied the interpretive principle of ejusdem generis, concluding that the use of "any other law" after a list of statutes meant that the Legislature was referring only to "other" statutes. Had it meant "or common law," the Legislature would have used that phrase, as it did in N.J.S.A. 17:16T-4(a), for example.

B.
"In interpreting a statute, our overriding goal is to give effect to the Legislature's intent." Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195, 927 A.2d 543 (2007). "`[T]he best indicator of that intent is the statutory language,' thus it is the first place we look. . . . If the plain language leads to a clear and unambiguous result, then our interpretive process is over." Ibid. (alteration in original) (quoting DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005)). As the Court has described its interpretive role:
We ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole. It is not the function of this Court to rewrite a plainly-written enactment of the Legislature or presume that the Legislature intended something other than that expressed by way of the plain language. We cannot write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment, or engage in conjecture or surmise which will circumvent the plain meaning of the act. Our duty is to construe and apply the statute as enacted.
[Soto v. Scaringelli, 189 N.J. 558, 569-70, 917 A.2d 734 (2007) (quoting DiProspero, supra, 183 N.J. at 492, 874 A.2d 1039).]
Only if there is ambiguity in the statutory language will a court turn to extrinsic evidence; when such evidence is needed, central among the variety of sources available is a statute's legislative history. Richardson, supra, 192 N.J. at 195-96, 927 A.2d 543. A reviewing court "may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language." DiProspero, supra, 183 N.J. at 493, 874 A.2d 1039.
If an agency is charged with enforcing a statute, courts generally afford substantial deference to that agency's interpretation *7 of the statute. Richardson, supra, 192 N.J. at 196, 927 A.2d 543 (citing R & R Mktg. v. Brown-Forman Corp., 158 N.J. 170, 175, 729 A.2d 1 (1999)). On appellate review, however, we are "`in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'" In re Taylor, 158 N.J. 644, 658, 731 A.2d 35 (1999) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973)).
Our analysis recognizes that, as both parties assert, cases exist to support either side's position regarding principles of statutory interpretation. For example, DEP argues that "any other law" includes both common law and statutory law, consistent with the interpretation of our state constitution's phrase "[a]ll law" in State v. Culver, 23 N.J. 495, 503, 129 A.2d 715, cert. denied, 354 U.S. 925, 77 S.Ct. 1387, 1 L.Ed2d 1441 (1957). But as defendant correctly points out, that constitutional provision states more fully "[a]ll law, statutory and otherwise . . .," and that second clause provides a basis for the broad reading, which the extension statute lacks.
In contrast, defendant cites cases where phrases following lists of statutes refer only to positive enactments, and not to common law, particularly when paired with the phrase "or regulation." For example, in Sprietsma v. Mercury Marine, 537 U.S. 51, 63, 123 S.Ct. 518, 526, 154 L.Ed.2d 466, 477-78 (2002), in interpreting a preemption provision of the Federal Boat Safety Act, 46 U.S.C.A. § 4306 (a state or political subdivision "may not establish, continue in effect, or enforce a law or regulation establishing" certain boating performance or safety standards), the United States Supreme Court wrote:
We think that this language is most naturally read as not encompassing common-law claims for two reasons. First, the article "a" before "law or regulation" implies a discretenesswhich is embodied in statutes and regulationsthat is not present in the common law. Second, because "a word is known by the company it keeps," Gustafson v. Alloyd Co., 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), the terms "law" and "regulation" used together in the pre-emption clause indicate that Congress pre-empted only positive enactments. If "law" were read broadly so as to include the common law, it might also be interpreted to include regulations, which would render the express reference to "regulation" in the pre-emption clause superfluous.
Applying this reasoning, we note that the extension statute lacks the article "a" before "law or regulation" and lacks a savings clause referring to the common law, both of which proved persuasive to the Sprietsma Court. See also Do Sung Uhm v. Humana, Inc., 620 F.3d 1134, 1153-54 (9th Cir.2010) (noting that the absence of a savings clause and article distinguished Sprietsma and compelled an evaluation of the statute's legislative history). Further, the approach of preemption, seeking to foreclose any action that a local government entity may undertake, is restrictive and contrary to the expansive attempt to maintain regulatory authority over polluters that applies here. Initially, we disagree with DEP that the statute is clear and unambiguous. Our analysis requires further inquiry.

C.
To properly interpret the extension statute, recognizing a lack of clarity, we focus on discerning the Legislature's intent. The extension statute was enacted to provide DEP with a specific period of additional time within which to initiate natural resource damages litigation. The Legislature did not use words of limitation such as *8 "only," "not to exceed," "limited by," or the like. Instead, the Legislature wrote that this provision applies except where some other provision "expressly and specifically applies," demonstrating breadth in applicability, and that the statute would be "subject to any statutory provisions or common law rules extending limitations," demonstrating breadth in duration. The definition of "State's environmental laws" is also broad, identifying nine statutes that address spills, water pollution, contaminated "Brownfield" sites, industrial sites, solid waste management, medical waste management, hazard waste facilities siting, sanitary landfill facility closure and low-level radioactive waste disposal facility siting. To that long and varied list, the Legislature added "or any other law or regulation by which the State may compel a person to perform remediation activities on contaminated property[.]" N.J.S.A. 58:10B-17.1(c). The term "or regulation" refers to a duly promulgated administrative rule, so the focus is on whether "any other law" is restricted to a legislative enactment or whether it includes other sources of law, such as common law.
The available legislative history supports DEP's position. In the 2001 Senate Environment Committee statement, the focus was on expanding the limitations period; no mention was made of curtailing the scope of DEP's regulatory authority:
The committee substitute would also establish a separate statute of limitations for civil actions brought by the State for the payment of compensation for damage to, or loss of, natural resources due to the discharge of a hazardous substance, pursuant to the State's environmental laws. A civil action must be commenced by the State no more than four years after the cause of action accrues. The substitute provides that the no cause of action would accrue for payment of compensation for damage to, or loss of, natural resources prior to January 1, 2002 or until the performance of the preliminary assessment, site investigation, and remedial investigation, if necessary, of the contaminated site or sanitary landfill facility, whichever is later. The substitute would also provide that actions covered by the limitations period established in section 5 of the committee substitute would not be subject to the limitations period established in P.L.1991, c. 387 (C.2A:14-1.2).
[Senate Environment Committee Statement To Senate Committee Substitute For Senate Bill No. 2345 (June 11, 2001).]
The Acting Governor's press release upon enactment of L. 2001, c. 154, provided a more definitive statement that DEP's regulatory authority was not being curtailed. That statement provided that the enactment
gives the state additional time to pursue legal actions against those who are responsible for contaminating sites around New Jersey. As a result of this act, responsible parties, not the taxpayers, will continue to be required to pay for the cleanup and the restoration of natural resources injured by that contamination. This bill continues the New Jersey Department of Environmental Protection's authority to require restoration of natural resources injured by a hazardous discharge as part of the remediation process.
[News Release, Office of the Governor, Acting Governor Donald D. DiFrancesco (July 13, 2001).]
The sponsor's statement and related history for the bill that became L. 2005, c. 245, specified the intent to "extend by 18 months the statute of limitations for civil actions brought by the State for the payment of compensation for damage to, or *9 loss of, natural resources due to the discharge of a hazardous substance, pursuant to the State's environmental laws." Sponsor's Statement to Assembly Bill No. 4469, L. 2005, c. 245 at 3. That statement explained that
for those sites on which the remedial investigation has been completed, the statute of limitations would have expired on January 1, 2006. This bill would provide the State an additional 18 months in which to bring a civil action for the payment of compensation for damage to, or loss of, natural resources due to the discharge of a hazardous substance, pursuant to the State's environmental laws.
[Ibid.]
The Legislature's goal was to provide DEP additional time, and it crafted the statute without using words of restriction. We are reluctant to interpret the extension statute to foreclose common law causes of action unless the legislative intent specifically provided otherwise.

D.
We reject defendant's argument that DEP took a contrary position five years ago, during briefing and argument in New Jersey Society for Environmental & Economic Development v. Campbell (NJSEED), No. MER-L-343-04. Our review of that proceeding reflects that it involved different factual and legal issues.
Ultimately, that litigation acknowledged the valid distinction between the State's right to litigate on behalf of its people to reclaim or recover natural resources that have been taken or destroyed, and its right to recover monies in civil litigation to compensate for prior periods of lost use of natural resources. DEP correctly recognized that the former right can be pursued without any statutory deadline, while reasonably believing that the latter right must be brought in a timely fashion now that the nullum tempus doctrine has been abolished. DEP has not advanced inconsistent legal positions in the NJSEED matter and the present appeal.

E.
Although DEP next claims that the trial judge's conclusion here is contrary to other caselaw, we note that the only cases cited are unreported and are neither precedential nor binding on us or the trial judge. See R. 1:36-3("No unpublished opinion shall constitute precedent or be binding upon any court.").
For completeness, we identify the cases referred to: New Jersey Department of Environmental Protection v. Occidental Chemical Corp., No. ESX-L-9868-05 (Law Div. March 31, 2008); New Jersey Department of Environmental Protection v. Azon Corp., No. L-1-05 (Law Div. January 9, 2007); and New Jersey Department of Environmental Protection v. Higgins Disposal Service, Inc., No. 01-0476 (D.N.J. September 1, 2009). These cases support the position that the extension statute applied to DEP's assertion of common law claims. A contrary result was reached in New Jersey Transit Corp. v. American Premier Underwriters, Inc. (American Premier), 2005 U.S. Dist. LEXIS 43212 (D.N.J. November 22, 2005).[3] None of these cases are precedential or binding.

*10 F.
Finally, DEP contends that the trial court's decision leads to absurd results. Because DEP would be required to file all of its claims in one action under the entire controversy doctrine, a shorter statute of limitations for common law claims against polluters would render the extension statute meaningless, an interpretive result that courts should avoid. The courts also have recognized legitimate timing issues relevant to DEP's filing of natural resource damages actions.
Defendant responds that this "absurdity" presumably refers to DEP's need to bring common law claims before site remediation would be complete, when the full natural resource injury may not yet be known. Defendant notes that this situation "would only occur at the unusually large and complex sites, where remediation takes longer than 10 years to complete. . . such as our Bayway and Bayonne sites. . . ."
DEP responds by noting that if defendant is correct, then DEP would have been required to bring the natural resource damages actions by January 1, 2002, for "the biggest and dirtiest sites with the widest array of impacted natural resources." The site remediation investigations for defendant's sites remain ongoing after eighteen years. Although defendant contends that under federal law, natural resource damages should be sought while site remediation is ongoing, DEP asserts that the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)[4] 42 U.S.C.A. § 9607(g) bars pursuit of federal natural resource damages actions while remediation proceedings are ongoing.
DEP's position regarding the federal law analogy is well founded. Under the CERCLA, "[t]he President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages." 42 U.S.C.A. § 9607(f)(1). The period within which actions for natural resource damages may be brought are governed by 42 U.S.C.A. § 9613(g)(1), a statute that applies with respect to any site listed on the National Priorities List (NPL), and "any vessel or facility at which a remedial action under this Act is otherwise scheduled. . . ." The statute provides that "an action for damages under this Act must be commenced within 3 years after the completion of the remedial action (excluding operation and maintenance activities). . . ." 42 U.S.C.A. § 9613(g)(1)(B). The statute further provides that "[i]n no event" may such an action be commenced "before selection of the remedial action if the President is diligently proceeding with a remedial investigation and feasibility study" under 42 U.S.C.A. §§ 9604(b) or 9620. Ibid.; Utah v. Kennecott Corp., 801 F.Supp. 553, 568 (D.Utah.1992) (quoting In re Acushnet River & New Bedford Harbor, 712 F.Supp. 1019, 1035 (D.Mass.1989)), appeal dismissed by 14 F.3d 1489 (10th Cir.), cert. denied, 513 U.S. 872, 115 S.Ct. 197, 130 L.Ed.2d 129 (1994) ("`customarily, natural resource damages are viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup, together with the lost use value and the costs of assessment. As a residue of the cleanup *11 action, in effect, they are thus not generally settled prior to a cleanup settlement'"). Natural resource damage claims are not permitted under CERCLA while remedial work is underway at a Superfund Site.
Actions to recover for damage to natural resources may depend upon the type of remedial action undertaken at a particular site, because the specifics of the remedial action may determine the extent of damage to natural resources that will remain at the site. If the remedial action takes care of most of the natural resource damage at the site, then a separate action for damages may not be necessary. Conversely, if at the conclusion of the remedial action substantial damage remains, then action to recover damages may be warranted. Since the judgment of the necessity for pursuing a damages action must necessarily await the final decision on the remedial action, it is best to ensure that the statute of limitations for bringing such damages actions does not force a premature decision.
[H.R. REP. NO. 99-253, pt. IV, at 53-54 (1985), reprinted in 1986 U.S.C.C.A.N. 3068, 3083-84.]
These federal law sources underscore the relevance of the timing of the commencement of natural resource damages claims. To insist that the common law claims must precede the statutory claims turns this rational procedure on its head. The reasoning that would allow for such a scenario would indeed generate an absurd result.
We conclude that the Legislature intended that "any other law" in the extension statute includes the common law strict liability claim at issue here. Accordingly, the trial judge erred in holding that the extension statute did not apply to that claim.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] Defendant inconsistently refers to its name as "ExxonMobil" and "Exxon Mobil." For ease of reference, we use the latter spelling.
[2] In N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp. (DEP v. Exxon Mobil I), 393 N.J.Super. 388, 923 A.2d 345 (App.Div.2007), we held that "an entity may be strictly liable under [the Spill Act] for damages for the loss of natural resources adversely affected by its discharge of hazardous substances[.]" Id. at 391, 923 A.2d 345.
[3] American Premier expressed concern that a common law limitations period raised in a pollution case may be of longer duration than that of a Spill Act claim if the latter were dismissed during the pendency of the litigation. Utah v. Kennecott Corp., 801 F.Supp. 553, 568 (D.Utah 1992) ("[C]ustomarily, natural resource damages are viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup, together with the lost use value and the costs of assessment. As a residue of the cleanup action, in effect, they are thus not generally settled prior to a cleanup settlement." (quoting In re Acushnet River & New Bedford Harbor, 712 F.Supp. 1019, 1035 (D.Mass.1989))), appeal dismissed by 14 F.3d 1489 (10th Cir.), cert. denied, 513 U.S. 872, 115 S.Ct. 197, 130 L.Ed.2d 129 (1994).
[4] 42 U.S.C.A. § 9601 to § 9675.